# In The Matter Of:
*DEMETRA STREET v.*
*WYLIE FUNERAL HOME, P.A., et al*

*DEPOSITION OF BRANDON WYLIE*
*November 1, 2022*



**D.C. OFFICE**
1101 Connecticut Ave., N.W.
Suite 450
Washington, D.C. 20036
(202) 628-**DEPO** (3376)

**MARYLAND OFFICE**
2833 Smith Ave
Suite 260
Baltimore, MD 21209
(410) 653-1115

"*Expect Accuracy & Quality!*"
ANYWHERE in the USA!
1-800-947-**DEPO** (3376)
Email: schedule@courtreporters-etc.com
www.courtreporters-etc.com

*Original File BWYL1101.TXT*
*Min-U-Script® with Word Index*

EXHIBIT 13

Page 1

1         UNITED STATES DISTRICT COURT FOR
              THE DISTRICT OF MARYLAND
2                (Northern Division)

3  DEMETRA STREET,        *

4        Plaintiff,       *

5  vs.                    *   CASE NO.:

6  WYLIE FUNERAL HOME,    *   RDB-21-cv-1970

7  P.A., et al,           *

8        Defendants.      *

9       *     *     *     *     *

10 DEPOSITION OF:

11         BRANDON MATTHEW WYLIE,

12 was held on Tuesday, November 1, 2022,

13 commencing at 1:58 p.m., at Mann & Casey,

14 P.A., 409 Washington Avenue, Towson,

15 Maryland, reported by Jeaninn Alexis, a

16 Certified Court Reporter.

17      *     *     *     *     *

18
        COURT REPORTERS, ETCetera, INC.
19        "Expect Accuracy & Quality"
          Maryland:    410.653.1115
20    Washington, DC:  202.628-DEPO (3376)
       ANYWHERE in the USA:  1.800.947-DEPO
21       schedule@courtreporters-etc.com

Page 2

1  APPEARANCES:

2

3  On behalf of the PLAINTIFF:

4     ALEXANDER J. COFFIN, ESQ.
      LAW OFFICE OF ALEX COFFIN, LLC
5     13862 Kimberly Drive
      Largo, Florida  33774
6     (410) 216-3339
      E-mail:  Alex.coffinlaw@gmail.com
7

8
   On behalf of the DEFENDANT:
9
      CHRISTIAN C. MANN, ESQ.
10    MANN & CASEY, P.A.
      409 Washington Avenue
11    Suite 600
      Towson, Maryland  21204
12    (410) 296-6826
      E-mail:  Jmarkel_mann@hotmail.com
13

14

15              -oOo-

Page 3

1           I-N-D-E-X

2   Deposition of Brandon Matthew Wylie

3         November 1, 2022

4

5  **EXAMINATION BY:** PAGE:

6  Mr. Coffin              4

7

8

9    (NO EXHIBITS MARKED.)

10

11

12          -oOo-

Page 4

1        P-R-O-C-E-E-D-I-N-G-S

2  WHEREUPON --

3        BRANDON MATTHEW WYLIE,

4  a Defendant, called for examination, having

5  been first duly sworn, was examined and

6  testified as follows:

7           **EXAMINATION**

8        **BY MR. COFFIN:**

9     Q.   Brandon, my name is Alex Coffin

10 and I'm going to be reading the same

11 instructions that I've read for the --

12      **MR. MANN:** I'll save you.  You

13 don't have to read it.  You heard the

14 instructions?

15      **THE WITNESS:** Twice.

16      **MR. COFFIN:** Fair enough.

17      **MR. MANN:** I'll save you.

18      **MR. COFFIN:** All right.  Well, I

19 figured the third time was a charm.  But,

20 anyway.  All right.  That's fine.

21      **BY MR. COFFIN:**

Page 5

1  Q. Okay. Can you please state your
2  name for the record?
3  A. Brandon Wylie.
4  Q. Do you have a middle name?
5  A. Matthew.
6  Q. Okay. Where do you live?
7  A. 3530 Dirkshire Circle,
8  Randallstown, Maryland.
9  Q. How long have you been at that
10 address?
11 A. About three years.
12 Q. What's your education background?
13 A. I went to the greatest high
14 school in the city, Baltimore City College.
15 Morgan State, Fayetteville Tech Community
16 College, Johns Hopkins University for an
17 MBA.
18 Q. Okay. And what licenses do you
19 hold?
20 A. I hold a license in mortuary
21 science to be a funeral director in the

Page 6

1  State of Maryland.
2  Q. Okay. Which Wylie Funeral Home
3  location employs you? Is it the
4  Randallstown location or the Mount Street?
5  A. Randallstown.
6  Q. And how long have you worked
7  there?
8  A. Where?
9  Q. Randallstown?
10 A. Since 2005.
11 Q. Okay. And what's your current
12 job role?
13 A. CEO.
14 Q. Okay. And what other roles have
15 you held at Wylie?
16 A. Started in the basement cleaning
17 toilets and then I went to making removals,
18 from there I went to making removals, went
19 away to college. Came back, I was an
20 apprentice, I embalmed, dressed, casket. I
21 make arrangements. Now, those are old

Page 7

1  roles. You want some new roles? Okay.
2  Cool.
3     So then from there, after I took
4  over as CEO, I take care of all of the
5  management. I also take care of the
6  accounting, the books, different things of
7  that nature, day-to-day practices of the
8  funeral.
9  Q. Okay. And what percentage of
10 your time would you say you spend at the
11 Randallstown location versus the Mount
12 Street location?
13 A. Probably about 80/20, about
14 80/20.
15 Q. 80 percent Randallstown?
16 A. 80 percent Randallstown. 20
17 percent --
18 Q. Mount Street?
19 A. Yes, sir.
20 Q. Do you hold any officerships,
21 directorships, ownerships in any other

Page 8

1  companies other than Wylie Funeral home?
2  A. Sure do. Yes.
3  Q. Okay. And what would those be?
4  A. I own a flower company and I also
5  own a mental health company.
6  Q. Okay. And is the flower company,
7  is that at all utilized by Wylie Funeral
8  Home?
9  A. No, they pay for flowers.
10 Q. I don't know what that means.
11 What do you mean "they pay for flowers"?
12 A. Do you utilize Walmart? No.
13 They provide us a service and we buy flowers
14 from them.
15 Q. Okay. So does Wylie Funeral Home
16 buy flowers from this flower company that
17 you have an ownership interest in?
18 A. Yes.
19 Q. Okay.
20 A. Actually, no. So Wylie Funeral
21 Home buys the flowers that they have for

Page 9

1  weekly arrangements to beautify the
2  locations.
3    Q.  When you say the locations, do
4  you mean the gravesite, or do you mean --
5    A.  No, I don't own a gravesite.  I
6  own a funeral home.
7    Q.  Okay.  What do you mean by
8  location?  I don't know what that means,
9  Brandon.
10   A.  You stated that the Funeral Home
11 were locations.
12   Q.  Right.
13   A.  So we are talking about for
14 funeral homes.
15   Q.  Right.
16   A.  So the two locations, so they
17 provide flowers for the hallway in the two
18 locations.
19   Q.  Okay.  Does your father have the
20 final say at Wylie?
21       MR. MANN: Objection.  Final say

Page 10

1  about what?
2        BY MR. COFFIN:
3    Q.  Decision making?
4    A.  Decision making about what?  If
5  we buy a new hearse?  Maybe.  If we -- what?
6    Q.  Okay.  So when disputes at Wylie
7  Funeral Home arise, who has the final say?
8    A.  There is no final say.  The final
9  say was asking the family.  Whatever wishes
10 that the family choose, and they make a
11 decision and that's what we follow through.
12   Q.  What shared services do the two
13 locations have, the Randallstown and the
14 Mount Street location?  Do you share
15 drivers, cars, computer systems, printing,
16 accounting, billing, payroll, employees?
17 What are the services?
18   A.  We share hearses.  We share -- we
19 share some of the similar drivers of those
20 vehicles.  And based on the law of the State
21 of Maryland, request that we have to have a

Page 11

1  license hanging if there's ownership.  But
2  typically all the morticians that work out
3  of one location stay at that location.
4    Q.  Okay.
5    A.  Unless something arises, which
6  typically doesn't.
7    Q.  When you say "unless something
8  arises," what does that mean?
9    A.  It means that if one location has
10 ten services today, of course you would need
11 someone to oversee those services.  So then
12 we would go either out into the city, find
13 us a mortician, or we would use a mortician
14 at our other location.
15   Q.  Are there any -- have there ever
16 been any complaints against you brought by
17 any government agency or regulatory board?
18   A.  No, sir.
19   Q.  Have you ever been sued, fined or
20 disciplined for anything related to your job
21 or profession?

Page 12

1    A.  Other than you, no.
2    Q.  Do you -- do you know of or have
3  you ever spoken with Rita Jeffers?
4    A.  Yes, I do know Rita Jeffers.  I
5  know Rita Jeffers from my father.  He's
6  known her for about 20 years or so.  He met
7  her in the street and over the time, we've
8  serviced many of her family members.
9    Q.  Okay.  Your father testified that
10 he didn't know Rita Jeffers.
11   A.  He probably did, but he does know
12 Rita Jeffers.  I think he may have gotten
13 the names mixed up.  You give him a lot of
14 different names that he thought.
15   Q.  So you said that your father has
16 known Rita Jeffers for 20 years?
17   A.  Yeah.
18   Q.  Okay.
19   A.  Maybe more.
20   Q.  And what would you consider Rita
21 Jeffers?  Would you consider her a friend of

Page 13

1  the family?  An acquaintance?
2    A.   I would consider her someone --
3  from my perspective, that's all I can really
4  talk about -- is that she's been a lady that
5  has come to the Funeral Home and we serviced
6  her family members.  I don't have a personal
7  relationship with her.
8    Q.   Okay.
9    A.   I just serve her just like any
10 other family.
11   Q.   Do you have any more of a -- do
12 you have a more personal connection with any
13 part of Rita's extended family?  Any --
14   A.   I don't know any other person
15 other than Rita.
16   Q.   Okay.  So have you ever spoken
17 with Rita Jeffers?
18   A.   Yes.
19   Q.   Okay.  When?
20   A.   Probably when she buried someone
21 in the family.

Page 14

1    Q.   Okay.
2    A.   But I -- yeah.  And then when you
3  released the article, that's when I really
4  talked to her.
5    Q.   Okay.
6    A.   I hadn't talked to her since
7  then, since you released the article.  So I
8  didn't deal with her at all with the Ivan
9  Street case.  Never talked to her in that.
10 I only talked to her after you released the
11 article.
12   Q.   Okay.  Tell me about the -- did
13 she call you, or did you call her?
14   A.   She came to the Funeral Home and
15 felt as though that the information that was
16 delivered in the article was false and it
17 never really happened.  And so she was
18 really adamant and really angry and she
19 wanted to go someplace to find so she could
20 tell the truth.  She feel as though it was
21 misrepresenting our Funeral Home and our

Page 15

1  brand and she just didn't want this to go
2  down this way.
3    Q.   What did you say to her?
4    A.   I said:  I really can't give you
5  the information.  What I can do is if you
6  may want to reach out or find something or
7  leave your number, then I will -- if ever
8  the opportunity comes up, then you can maybe
9  be deposed by the lawyers whoever is going
10 through this process with --
11   Q.   Okay.  So did she show up to the
12 Funeral Home unannounced, or did she call
13 you and say --
14   A.   She doesn't have my number.
15   Q.   Okay.
16   A.   So she showed up unannounced.
17   Q.   So she showed up unannounced and
18 she asked to meet with you?
19   A.   No, she asked Carla.  So what
20 happened was, she came to the Funeral Home,
21 the lady at the desk, she said:  Hey, Rita

Page 16

1  Jeffers, I want to talk to you about the
2  case.  So then what they did was they patch
3  me -- they sent me her number and I gave her
4  a phone call at that time.  That was the
5  first time we ever talked on the phone.
6    Q.   Okay.  Did you discuss the
7  factual situation of the case with her at
8  all?
9    A.   No.  She just wanted to talk to
10 me about what she felt was going on and that
11 she wanted to have an opportunity to share
12 her part.  But I never disclosed anything
13 about the case at that time.
14   Q.   Did you discuss anything with her
15 about the newspaper article?
16   A.   She discussed it with me.  I
17 didn't really say anything.  I just
18 listened.  You know, I don't have the
19 privilege.  I didn't feel as though it was
20 necessary to tell her all this information.
21 So whatever -- whatever she discussed was

Page 17

1 based upon the situation, and she just
2 said -- I said, "I can't really talk to you,
3 you know, but if you find the right person,
4 I think you can talk to them."
5  Q. Did -- do you know if she spoke
6 with anyone else at the Funeral Home that
7 day that she arrived?
8  A. I don't know. I wasn't at the
9 Funeral Home.
10  Q. Okay. So she called -- she came
11 to the Funeral Home and then she called you
12 from the Funeral Home?
13  A. Yeah.
14  Q. Okay. Okay. But are you aware
15 of if she --
16  A. Now you realize you missed a
17 step. She called -- she came to the Funeral
18 Home, she talked to someone at the desk and
19 then they called me. There's your step.
20  Q. Okay. And you don't know if she
21 spoke to anyone else?

Page 18

1  A. I wasn't there.
2  Q. Did you have any involvement in
3 the final arrangements for Ivan Street?
4  A. Aside from when the two wives
5 were presented, and the final conversation
6 about what can we do, we all got together
7 and we discussed that information and what
8 we felt as though because he has two wives
9 that cremation couldn't be possible.
10 Cremation is a final disposition and cannot
11 be undone.
12   And so we have -- my suggestion
13 to the staff in which they followed was to
14 go back and talk to the family, which family
15 includes both wives, because they are his
16 family and his custody and go back and let
17 them know what their options are. And their
18 options were to have a burial. They can't
19 afford it because obviously they don't have
20 any money because basically they're going to
21 social service. So that way what we would

Page 19

1 do, we would provide for them a casket. We
2 provide for them a burial site. We will
3 take care of it. Here's the options for
4 burial sites. They came down and said, Mr.
5 Wylie, we don't want to do anything that's
6 expensive, what's the least expensive burial
7 site? We said Mount site.
8   So at that point, everybody
9 says -- I said that -- at that point,
10 everyone there basically agreed to the
11 burial, per Devin, and then we move forward
12 with the burial. So my suggestion was to
13 inform all of them, the two wives and the
14 cousin.
15  Q. So the burial is more expensive
16 than the cremation; is that correct?
17  A. Absolutely.
18  Q. Okay. And would Wylie Funeral
19 Home have lost money on having to provide
20 the services for a burial?
21  A. Wylie Funeral Home did lose money

Page 20

1 on having to perform the services of the
2 burial.
3  Q. Okay. Why was a burial performed
4 and not -- I don't really know what the
5 correct phrase would be. But why do -- why
6 do anything with the body? I mean, why not
7 just leave the body, I guess, you know, sort
8 of in a level of suspension on ice? I mean,
9 there are certainly times where, you know,
10 it's not time to bury someone yet, disputes
11 arise. Why not just wait?
12  A. A dispute --
13   MR. MANN: Objection.
14   THE WITNESS: Okay.
15   MR. MANN: You can answer.
16   THE WITNESS: A dispute occurs
17 when all parties aren't in agreement.
18   BY MR. COFFIN:
19  Q. Um-hum.
20  A. Okay. So that was -- that was
21 what we decided, was to go and ask the

Page 21

1 family members and offer them this option.
2 So with this option, no, we could not
3 cremate because creation is final, so the
4 next option would be for burial. So you
5 can't afford burial, we are going to give
6 you this option because we can't -- we don't
7 want to leave this unembalmed person just
8 laying around the Funeral Home for them to
9 decompose. Even though she was under
10 refrigeration, it still -- it still wasn't a
11 very good practice as far as when you are
12 talking about funeral services and dealing
13 with families.
14     And so we gave them a way to
15 create their closure and to find a pathway
16 to start to deal with their grief and they
17 all accepted this option as a very -- as a
18 good option for them to move forward.
19   Q.  When you say "they all
20 accepted" --
21   A.  When I -- go ahead.

Page 22

1   Q.  Yeah. Please let me finish the
2 question.
3   A.  I thought I was asking the
4 questions.
5   Q.  When you say they all accepted
6 the option, who is "they all"?
7   A.  They all would be Demetra Street,
8 I guess her name is Rene Cooke, and Ms. Rita
9 Jeffers.
10   Q.  Okay. And how did they all
11 accept the decision?
12   A.  When Devin called them, they all
13 agreed to it.
14   Q.  Okay. And is it your
15 understanding that Devin called them each
16 individually, or --
17   A.  My understanding is that Devin
18 called them all each individually.
19   Q.  Is that typical, or would it --
20 or do you typically involve all the parties
21 at once in sort of a group phone call when

Page 23

1 you're making a hard decision like that?
2     MR. MANN: Objection.
3     You can answer.
4     THE WITNESS: Okay. So none of
5 this is typical. Typically, we deal with
6 one person. But in this case, you have
7 three people who have the right and duty to
8 dispose of the body. So, actually, you have
9 three people. Well, you actually have two
10 people, which is Rene Cooke and you have
11 Demetra Street which has the right and duty
12 to dispose of the body.
13     So they had included Rita in this
14 because Rita is their -- is pretty much
15 their spokesman and the person paying for
16 their services. So that way, Rita is
17 included in that conversation. So then you
18 call all of the persons. The two people
19 that have the right and duty of the disposal
20 and the one person that's paying for the
21 bill. So, therefore, typically that right

Page 24

1 and duty and the person paying for the bill
2 is only one person, but in this case, it's
3 three. So we called each one of them
4 individually.
5   Q.  So you say it's not typical. But
6 what about situations where a husband and a
7 wife disagree about how a son or daughter is
8 to be, you know, either cremated or buried?
9 Is that a typical --
10   A.  No, that's not very typical.
11   Q.  Does it happen?
12   A.  It can.
13   Q.  Okay. And in situations like
14 that, are you speaking with both of the
15 parties at the same time, or are you
16 individually calling the mother and father
17 of the diseased individually?
18     MR. MANN: Objection.
19     THE WITNESS: I don't see the
20 relevancy of that situation to this case.
21     BY MR. COFFIN:

Page 25

1  Q.  I'm just asking a question.
2  A.  Does it have anything to do with
3  two wives and a cousin?
4  Q.  I'm just asking you what you
5  would do in that situation?
6      MR. MANN: Object.
7      But you can answer, if you can.
8      THE WITNESS: I can't answer the
9  question.
10     BY MR. COFFIN:
11 Q.  Okay. So -- okay. How much
12 would you say you know about marriage
13 certificates?
14 A.  Nothing.
15     MR. MANN: Objection.
16     MR. COFFIN: On what basis?
17     MR. MANN: How much does he know
18 about death certificates?
19     MR. COFFIN: Marriage --
20     MR. MANN: First of all, that
21 question is so vague and I don't know

Page 26

1  exactly what you're asking him to answer.
2  And how is it relevant? If you want to ask
3  him a specific question about a death
4  certificate, you can do that.
5      MR. COFFIN: Sure.
6      BY MR. COFFIN:
7  Q.  You know the difference between a
8  gold seal marriage certificate and a
9  non-sealed marriage certificate?
10 A.  No.
11 Q.  Did you ever have any
12 conversations with Rene Cooke?
13 A.  No.
14 Q.  Do you know Rene Cooke?
15 A.  No.
16 Q.  Other than Devin Conner, did you
17 speak to anyone at Wylie Funeral Home about
18 this, what I will refer to, the two wives
19 dispute? I'm happy to elaborate, but I
20 think we all know what we're talking about
21 here. The fact that Rene Cooke identified

Page 27

1  herself as the wife and that Demetra Street
2  identified herself as the wife. Did you
3  ever speak to anyone else other than Mr.
4  Conner about that at Wylie?
5  A.  Yes.
6  Q.  Who?
7  A.  Mr. Wylie.
8  Q.  Okay. And what was that
9  conversation?
10 A.  It was a group conversation
11 between me and Devin and Mr. Wylie. You
12 know, they asked what was the next steps and
13 Devin and Mr. Wylie decided that they should
14 go to the State Board to find out any
15 information and then file with the State
16 Board. The State Board instructed them to
17 go to your lawyer.
18     You want me to finish my answer,
19 or do you want to keep talking to your --
20 Q.  I thought you were done.
21 A.  And so also I talked to Devin and

Page 28

1  Mr. Wylie when we made the decision to talk
2  to the families about how they -- about the
3  options that they had to properly dispose of
4  him, Mr. Ivan Street, because he could no
5  longer be cremated because there's no real
6  line because he has two wives.
7  Q.  Okay. So was anyone else present
8  for the meeting?
9  A.  What meeting?
10 Q.  The two-wives situation where you
11 discussed, the two different wives? You
12 said it was you there, Devin Conner --
13 A.  I was on the phone.
14 Q.  Okay.
15 A.  I was on the phone and Tuverla
16 Livingston was there too.
17 Q.  Okay. What did Tuverla say?
18 A.  I don't recall.
19 Q.  Was any investigation or any
20 research done into the Maryland marriage
21 records?

Page 29

1  A. Yeah, we -- I think we looked
2  up -- I think we had the lawyer look up some
3  divorce decrees or something, and there
4  weren't any, to our knowledge. No divorce
5  decrees.
6  Q. Okay. Were marriage records
7  investigated?
8  A. I'm not sure. They were
9  presented.
10  Q. Other than that meeting with
11 Devin Conner, Tuverla Livingston, your
12 father and you were on the phone, did you
13 discuss the two-wives situation with anyone
14 else in any other circumstances?
15  A. No.
16  Q. Okay. Did you instruct anyone at
17 Wylie Funeral Home to route Demetra Street's
18 telephone calls for Devin Conner to your
19 father?
20  A. No.
21  Q. Did you make the decision to bury

Page 30

1 Ivan Street?
2  A. No, sir.
3  Q. Who made that decision?
4  A. The family decided as a group --
5  or not as a group, but individually.
6  Q. Did you make the decision to
7 place an empty urn at Ivan Street's memorial
8 service?
9  A. No, sir.
10  Q. Who made that decision?
11  A. Family. Two wives and the
12 cousin.
13  Q. Did you ever overhear or
14 participate in any telephone conversations
15 between your father and Demetra Street?
16  A. No, sir.
17  Q. Did you have any conversations
18 with anyone outside of the Funeral Home
19 about the case? Did anyone call you about
20 the news article and discuss the news
21 article or discuss the facts of the case

Page 31

1 with you?
2      MR. MANN: Objection. Outside of
3 the conversations with me.
4      MR. COFFIN: Correct. Correct.
5      MR. MANN: Go ahead and answer.
6      THE WITNESS: A lot of people,
7 you know, a lot of people in the city of
8 Baltimore. We do a lot of good things for
9 people in the neighborhood and the community
10 and a lot of people respect us for what we
11 do. And because of the fact that they
12 respect us for what they do, they really
13 thought that the situation wasn't reflective
14 of who we are and what we do, and they felt
15 as though we were being -- being really
16 targeted by some group or some lawyer
17 because we felt as though that these
18 accusations, you know, just didn't make
19 sense. So, you know, it was a lot of people
20 that called us. Plenty texts, phone calls,
21 emails, you know. So that's what happened.

Page 32

1      BY MR. COFFIN:
2  Q. What did you discuss in those
3 phone calls or emails? I mean, I know -- I
4 knew you said that they, you know, they sort
5 of had this view. But what, if anything,
6 did you discuss about --
7  A. I can't -- the same thing I told
8 the reporter in the article. I can't
9 discuss any of this information. If you
10 want to, you can go to the lawyers but I
11 can't really discuss it. I understand how
12 sympathetic you may be, but just keep us in
13 your prayers.
14  Q. Okay. So you never -- you never
15 discussed anything with anyone outside of
16 the Funeral Home in terms -- about the facts
17 of this case from the time that the -- I
18 mean from the time that the suit was filed
19 until today?
20  A. No, sir.
21  Q. Okay.

Page 33

1    **MR. COFFIN:** We are good.
2    **MR. MANN:** Waive reading and
3    signing -- I don't know why I said that. We
4    will read and sign.
5    **THE REPORTER:** No problem, Mr.
6    Mann. And would you like a copy of all
7    three of the --
8    **MR. MANN:** Sure thing.
9    (Reading and signing reserved.)
10   (Deposition concluded 2:23 p.m.)

Page 34

1    CERTIFICATE OF COURT REPORTER
2    I, JEANINN ALEXIS, do hereby
3    certify that the proceedings were recorded
4    by me stenographically and electronically at
5    the time and place mentioned on the cover
6    sheet thereof, and, thereafter, transcribed;
7    that said hearing is a true record of the
8    statements made; that I am neither counsel
9    for, related to, nor employed by any of the
10   parties to this proceeding;
11   And further, that I am not
12   financially or otherwise interested in the
13   outcome of this matter.
14   As Witnessed by my hand and
15   signature as indicated below.
16
17
18   *[signature]*
19   ------------------------
20   JEANINN ALEXIS
     Certified Court Reporter
21

Page 35

1    DATE SENT: December 2022
2            ERRATA SHEET
3    DEPOSITION OF: Brandon Matthew Wylie
4           DATE: November 1, 2022
5           CASE: Demetra Street vs.
                  Wylie Funeral Home, et al
6    INSTRUCTIONS:
7    1.  Please read the transcript of your
         deposition and make note of any
8        corrections or changes on this Errata
         Sheet.
9
     2.  Indicate below general reason for
10       change, such as:
             A.  To correct stenographic error.
11           B.  To clarify record.
             C.  To conform to the facts.
12
     3.  Sign the Certificate of Deponent page.
13
     4.  Within 30 days of the Date Sent, return
14       this Errata Sheet, and signed
         Certificate of Deponent, to the address
15       listed below AND to all Counsel listed
         on the Appearances page.
16
     PAGE #    LINE #    CORRECTION         REASON
17   _____
18   _____
19   _____
20   _____
         COURT REPORTERS, ETCetera, INC.
      2833 Smith Avenue/#260/Baltimore, MD 21209
21         Errata@Courtreporteretc.com

Page 36

1             ERRATA SHEET
2    DEPOSITION OF BRANDON MATTHEW WYLIE:
3    PAGE #    LINE #    CORRECTION         REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____

```
 1              CERTIFICATE OF DEPONENT
 2            I hereby certify that I have read
 3   and examined the foregoing transcript and:
 4   (Check one of the following)
 5            (  )  The same is a true and
 6   accurate record of the testimony given by
 7   me, and I have made no corrections to this
 8   transcript.
 9                      -OR-
10            (  )  Any additions or
11   corrections that I feel are necessary, I
12   have listed on the attached Errata Sheet.
13            As witness my hand and signature
14   this _____ day of _____.
15
16                 - - - - - - - - - - - - -
                   BRANDON MATTHEW WYLIE
17
18
19
20
21
```